HEINRICH v CITY OF DETROIT

Docket No. 77-2906. Submitted October 11, 1978, at Detroit.—Decided June 19, 1979. Leave to appeal applied for.

Edgar W. Heinrich owned a building in the City of Detroit. In 1962, the city approved a massive urban renewal plan, entitled University City Rehabilitation Project. Heinrich's property was included within the project. His commercial tenants attended a meeting in 1962 and were told to expect the city to be knocking on their doors by 1965. One tenant, Esterling Tri-Craft Printing, called the city in 1964 and received assurances that the condemnation would occur at least by 1967, the year their lease with Heinrich ended. Esterling was acquired by another printing company in 1965 and its operations were moved. However, Heinrich's building was used by the printing company for storage and lesser operations until the expiration of its lease. Also in 1965, the city informed Heinrich that his building would not be acquired until 1968 or 1969. The city's letter distinctly conveyed the impression that plaintiff's building would be acquired, but that Federal funding requirements prevented early acquisition. After Heinrich's tenants moved out in 1967, he listed the building for rental but did not acquire new tenants. By 1969, all acquisition efforts relating to the project ended due to a lack of funding. In 1967, the Detroit riots caused extensive damage near the Heinrich building. In 1968, with the building still vacant, Heinrich was unable to pay his property taxes. The State of Michigan acquired title in a tax sale and deeded the property to the city in 1973. The property was subsequently incorporated into the expansion of a local high school. Heinrich brought an action in inverse condemnation against the City of Detroit, County of Wayne, the Board of Education and Albert Lee, Auditor General of the State of Michigan, alleging that various individual and joint acts by the defendants in the management of the urban renewal project affected his property so adversely as to amount to

REFERENCES FOR POINTS IN HEADNOTES
[1] 26 Am Jur 2d, Eminent Domain § 157 et seq.
[2] 27 Am Jur 2d, Eminent Domain § 353.
[3, 4] 27 Am Jur 2d, Eminent Domain § 275.

a de facto taking without just compensation. Wayne Circuit Court, Thomas J. Foley, J., found that there was no evidence that Esterling would have remained after the expiration of its lease, nor that the impetus to sell out its holdings came from the threatened condemnation; that there was no evidence that the city and the Board of Education acted in concert to deprive plaintiff of his property, although the board was at all times interested in acquiring plaintiff's property, it took no steps to do so until after the city failed to proceed with acquisition under the project; and, that while the threatened condemnation may have hindered plaintiff's ability to rent the building, he failed to establish the city's actions—as opposed to the general area blight and the destruction caused by the 1967 riots—were the cause, or even the greater cause of this inability. The court concluded that no de facto taking occurred and found no cause of action in favor of codefendants City of Detroit and the Detroit Board of Education. Plaintiff appeals. *Held:*

The trial court did not err in finding that the city's actions in carrying out its urban renewal project were not so egregious as to constitute an abuse of its eminent domain power. The specific contacts with the plaintiff and his tenants and the level of publicity attending the announced condemnation fall short of conduct found to be an abuse of eminent domain power in similar cases. While delay created a cloud over plaintiff's property, it cannot be said that the city deliberately stalled completion of the project to benefit from reduced property values. Plaintiff failed to prove that the city's actions, even assuming abuse occurred, substantially contributed to his loss of revenue. Trial evidence fails to support the conclusion that plaintiff's failure to re-rent his property was substantially caused by prospective tenants' fear of future condemnation. No causal connection was established between Esterling's decision to sell and the planned condemnation of plaintiff's building. There was, however, substantial evidence that the blighted condition of the neighborhood and the 1967 riots contributed to the loss of established businesses and vacant property. The trial court's findings concerning the Detroit Board of Education's role in these events were not so clearly erroneous as to require reversal.

Affirmed.

1. EMINENT DOMAIN — PRIVATE PROPERTY — TAKING FOR PUBLIC USE — GOVERNMENTAL ACTION — CONVERSION — INJURY TO PROPERTY — EXCLUSION OF OWNER.

It is well settled in Michigan law that a taking of private

property for public use may occur without absolute conversion of the property, including cases where the value is destroyed by the action of the government, or serious injury is inflicted to the property itself, or exclusion of the owner from its enjoyment, or from any of the appurtenances thereto.

2. EMINENT DOMAIN — PRIVATE PROPERTY — TAKING FOR PUBLIC USE — LOSS OF REVENUE — INABILITY TO RENT — URBAN RENEWAL — CITY ACTIONS.

A loss of revenue and inability to rent property may constitute a taking of private property for public use where the owner can establish a causal connection between his loss and a city's actions in carrying out an urban renewal program.

3. EMINENT DOMAIN — PRIVATE PROPERTY — TAKING FOR PUBLIC USE — PUBLICITY — REDUCTION IN VALUE — EVIDENCE — ABUSE OF DISCRETION.

The mere threat of condemnation and its attendant publicity, without more, is insufficient to constitute a taking of private property for public use without just compensation; to determine whether the governmental entity abused its exercise of legitimate eminent domain power to a property owner's detriment, a court should examine the totality of the acts alleged to have constituted the taking.

4. EMINENT DOMAIN — PRIVATE PROPERTY — TAKING FOR PUBLIC USE — GOVERNMENTAL ACTIONS — REDUCTION IN VALUE — URBAN RENEWAL — BURDEN OF PROOF.

A plaintiff may recover damages for inverse condemnation in a case where the acts of a city are alleged to have resulted in lost rentals and diminution of property value due to a threatened condemnation of his property for urban renewal if he can show that the actions of the city substantially contributed to and accelerated the decline in value; even where abuses by a city can be established, the plaintiff has the burden of proving a causal connection between the city's actions and his alleged loss; a plaintiff may satisfy this burden by proving the city's actions were a substantial cause of the decline of his property's value and that the city abused its legitimate powers in affirmative actions directly aimed at his property.

*Travis, Warren, Nayer & Burgoyne, P.C.* (by *George E. Ward* and *John M. Roche*), for plaintiff.

*Boris K. Yakima,* for defendant City of Detroit.

*Kenneth N. Hylton,* for defendant Detroit Board of Education.

Before: M. F. CAVANAGH, P.J., and D. E. HOLBROOK, JR. and N. J. KAUFMAN, JJ.

M. F. CAVANAGH, P.J. Plaintiff, Edgar William Heinrich, appeals as of right from the trial court's finding of no cause of action in favor of codefendants City of Detroit and Detroit Board of Education.

Plaintiff brought an action in inverse condemnation against defendants, alleging that various individual and joint acts by the defendants in the management of an urban renewal project affected his property so adversely as to amount to a de facto taking without just compensation.

Plaintiff owned a building on Canfield in the City of Detroit. In late 1962, the city approved a massive urban renewal plan, entitled, "University City Rehabilitation Project", to condemn and rehabilitate 304 acres in the area near Wayne State University. This plan was divided into five smaller projects; plaintiff's building was included in the third project, slated for educational/recreational use.

The University City plan contained two planning and survey phases prior to acquisition of property. It is apparent from the record that the financial involvement of the Federal government considerably protracted completion of all phases. The Federal government also obligated the city to publicize its urban renewal plans by means of public meetings. One such meeting, respecting Project 3, was held on July 21, 1962. Plaintiff's commercial tenants attended that meeting and were told to "expect the City knocking on their doors as early as 1965". One tenant testified that

he had the impression from the meeting that the property would eventually be taken.

As of the date of that meeting, plaintiff's tenant, Esterling Tri-Craft Printing, had five years remaining on its lease. In late 1964, the president of that company called the city and received assurances that the condemnation would occur at least by 1967, the year the company's lease ended. However, in 1965, Esterling was acquired by another printing company who moved Esterling's operations, as well as those of five other similarly acquired companies, to its main plant. Until the expiration of its lease, Esterling used the plaintiff's building for storage and lesser operations. The trial court found that there was no evidence that Esterling would have remained after the expiration of its lease, nor that the impetus to sell out its holdings came from the threatened condemnation.

Also in 1965, the city informed the plaintiff, in response to his letter expressing his concern at the deterioration and vandalism of his property, that his building would not be acquired until 1968 or 1969. The city's letter distinctly conveyed the impression that plaintiff's building would be acquired, but that Federal funding requirements prevented early acquisition. After plaintiff's tenants moved out in 1967, plaintiff listed the building for rental, but did not acquire new tenants.

By 1969, all acquisition efforts relating to Projects 3, 4 and 5 ended due to lack of funding. In 1967, the Detroit riots caused extensive damage in the neighborhood near plaintiff's property, although his building and the block in which it stood were not harmed. In 1968, with the building still vacant, plaintiff was unable to pay his property taxes. The State of Michigan acquired title in a tax sale, and deeded the property to the city in

1973. Plaintiff's property subsequently was incorporated into the expansion of a local high school.

The trial court found no evidence that the city and the board acted in concert to deprive plaintiff of his property. The trial court found that although the defendant Board of Education was at all times interested in acquiring this property, it took no active steps to do so until after the city failed to proceed with acquisition under Project 3. It also held that while the threatened condemnation may have hindered plaintiff's ability to rent the building, he had failed to establish that the city's actions—as opposed to the general area blight and the destruction caused by the 1967 riots —were *the* or even the greater cause of this inability. It concluded, therefore, that no de facto taking occurred.

In addition to challenging as clearly erroneous the trial court's finding of fact that no taking occurred, the plaintiff asserts that the trial court erred in defining both the proper standard of causation to be applied in inverse condemnation cases and the nature of the plaintiff's burden of proof in such actions.

It is well settled in Michigan law that a "taking" of private property for public use may occur without absolute conversion of the property in question. It includes as well

"[c]ases where the value is destroyed by the action of the government, or serious injury is inflicted to the property itself, or exclusion of the owner from its enjoyment, or from any of the appurtenances thereto. In either of these cases it is a taking within the meaning of the provision of the Constitution."

*Pearsall v Board of Supervisors,* 74 Mich 558, 561; 42 NW 77 (1889), *In re Urban Renewal, Elmwood*

*Park Project,* 376 Mich 311; 136 NW2d 896 (1965), *Foster v Detroit,* 254 F Supp 655 (ED, Mich 1966), *aff'd* 405 F2d 138 (CA 6, 1968). The plaintiff's alleged loss of revenue and inability to rent his property would fall within this definition, assuming that he can establish the causal connection between his loss and the city's actions in carrying out its urban renewal programs.[1]

Related to this issue of causation it is further apparent that not all government actions may amount to a taking for public use. In those cases finding a taking, the courts examined both the intensity and form of the accompanying publicity and the deliberateness of specific actions directed at a particular plaintiff's property by the city to reduce its value. *Madison Realty Company v Detroit,* 315 F Supp 367, 371 (ED Mich, 1970). See also, *Richmond Elks Hall Ass'n v Richmond Redevelopment Agency,* 561 F2d 1327 (CA 9, 1977). The mere threat of condemnation and its attendant publicity, without more, is insufficient. Therefore, before a court may conclude that a taking occurred, it must examine the totality of the acts alleged to determine whether the governmental entity abused its exercise of legitimate eminent domain power to plaintiff's detriment. *Sayre v Cleveland,* 493 F2d 64, 69 (CA 6, 1974) *In re Urban Renewal, Elmwood Park Project, supra,* at 318.[2]

---

[1] Plaintiff directs our attention to several cases from other jurisdictions to support his contention that the destruction of a property's income capacity, as well as its decline in value, may constitute a taking. Recourse to other jurisdictions, in our opinion, is unnecessary. The Michigan precedent cited in the body of this opinion includes such destruction within those interferences with an owner's enjoyment of his property that constitute a taking.

[2] Plaintiff has cited a number of cases from other jurisdictions that found a taking on facts similar to those in the case at bar. At first glance, these cases appear to support the proposition that if publicity and the threat of condemnation cause a property owner to lose

Finally, even where abuses can be established, a causal connection must be drawn between the government's actions and an individual's alleged loss. In *Muskegon v DeVries,* 59 Mich App 415, 420; 229 NW2d 479 (1975), *lv den* 394 Mich 787 (1975), it was held that a plaintiff in inverse condemnation must prove that the government's actions were *the* cause of the taking. The Court in that case cited no precedent for its conclusion. However, establishment of a causal link, in cases involving a city's management of an urban renewal program, may be hindered by the presence of other factors affecting a property's viability, such as neighborhood deterioration, urban blight and commercial obsolescence. Ironically, these factors may have provided the impetus for the urban renewal program in the first place and yet obscure even a plaintiff's legitimate right to compensation. See *Foster, supra,* at 662.

In our view, the *Muskegon* analysis (which apparently was followed by the trial court

tenants and income to such an extent that the owner risks losing that property, he is entitled to compensation. *Conroy-Prugh Glass Company v Commonwealth Department of Transportation,* 456 Pa 384, 392-393; 321 A2d 598, 602 (1974), *Reingold v Urban Redevelopment Authority of Pittsburgh,* 20 Pa Commw 266; 341 A2d 915 (1975), *Washington Market Enterprises, Inc v Trenton,* 68 NJ 107; 343 A2d 408 (1975). However, a careful reading of the *Reingold* and the *Washington Market* opinions reveals the court's reliance on specific acts by the condemning authority directed at the plaintiff's particular property, in addition to publicity, in concluding a taking occurred. The acts noted included condemnation of neighboring properties, discouragement of long-term leasing, and a continuing pattern of condemnation in the area. See *Reingold v Urban Redevelopment Authority of Pittsburgh, supra,* at 268, fn 2, *Washington Market Enterprises, Inc v Trenton, supra,* at 111-112, 118-119. In this emphasis, the holdings of these cases are not inapposite to the Michigan and 6th Circuit Federal holdings cited in the body of the opinion. Although the strongest statements concerning the effect of publicity on the existence of a taking appear in the *Conroy-Prugh* opinion, we note, in declining to follow its reasoning, that its holding is extremely fact-specific and turns on the indisputable inevitability of condemnation of the plaintiff's property.

in the instant case[3]) takes too narrow an approach to the question of causation. We are presuaded that the better view is stated in *Foster v Detroit, supra,* 655, and relied on in *Madison Realty Company v Detroit, supra,* at 371. A plaintiff may recover in inverse condemnation where:

"[t]he actions of the defendant * * * *substantially contributed to* and accelerated the decline in value of plaintiff's property." (Emphasis added.) *Foster v Detroit, supra.*

even where other conditions may have adversely affected property values as well.

As for the plaintiff's burden of proof in inverse condemnation actions, we would agree with the opinion in *Muskegon v DeVries, supra,* insofar as it holds that the plaintiff has the burden of proving causation. However, a plaintiff may satisfy this burden by proving that the government's actions were a *substantial* cause of the decline of his property's value. It also appears that the plaintiff must establish the government abused its legitimate powers in affirmative actions directly aimed at the plaintiff's property. *Sayre v Cleveland, supra,* at 69, *Madison Realty Company v Detroit, supra,* at 370-371. *Holloway Citizens Committee of Lapeer & Genesee Counties, Inc v Genesee County,* 38 Mich App 317, 320; 196 NW2d 484 (1972). After examining the records and the trial court's findings of fact and conclusions of law,

---

[3] It is in fact unclear from the opinion exactly what test of causation the trial court employed in concluding no taking occurred. The court found, somewhat ambiguously, that the plaintiff failed to establish that the city's announced future condemnation "was *the* cause or even the greater cause of plaintiff's loss of revenue from his building". (Emphasis in the original.) We will assume, *arguendo,* that the trial court relied primarily on the former test.

we would agree with plaintiff that the trial court appeared to adopt an overly narrow test of causation. Nevertheless, even using the "substantial cause" test outlined above, we decline to reverse.

We are persuaded that the trial court did not clearly err in finding that the city's actions in carrying out its urban renewal project were not so egregious as to constitute an abuse of its eminent domain power. The specific contacts with the plaintiff and his tenants and the level of publicity attending the announced condemnation fall short of conduct found to be an abuse of the eminent domain power in similar cases. While the delay in carrying out the condemnation certainly created a cloud over the plaintiff's property, we cannot say that the city deliberately stalled completion of the project to benefit from reduced property values. Compare *Foster v Detroit, supra,* at 662.

Nor has the plaintiff proved that the city's actions, even assuming abuses occurred, substantially contributed to his loss of revenue. Although the plaintiff failed to re-rent his property, the evidence presented at trial does not support the conclusion that this failure was substantially caused by prospective tenants' fear of future condemnation. In the same manner, no causal connection was established between the tenant printing company's decision to sell their business and the planned condemnation of plaintiff's building. There was, on the other hand, substantial evidence that the blighted condition of the neighborhood induced the introduction of the renewal program in the first place. Evidence also showed that plaintiff's property was in or immediately adjacent to one of the most severely damaged business areas during the 1967 riots, and that in the aftermath of these civil disturbances, entire neighborhoods in

the City of Detroit suffered generally from loss of established businesses and vacant property.

We also find, upon review of the proofs presented, that the trial court's findings concerning the Detroit Board of Education's role in these events, were not so clearly erroneous as to require reversal.

We have reviewed the briefs and the record as to the remaining allegations and find no error occurred.

Affirmed. No costs, a public question being involved.

D. E. Holbrook, Jr., J., concurs in the result only.