**Albert FRUMAN, Plaintiff,**

v.

**CITY OF DETROIT, a Michigan Municipal Corporation, Defendant.**

**No. 96–CV–75170–DT.**

United States District Court, E.D. Michigan, Southern Division.

March 31, 1998.

---

**3.** The RIM process is not even mentioned in the Second Amended Complaint.

David M. Fried, Paul Weisberger, Bingham Farms, MI, Lee S. Fruman, Franklin, MI, for Plaintiff.

Diane Hutcherson, Alan Carlton, Detroit, MI, for Defendant.

## OPINION AND ORDER REGARDING DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT

ROSEN, District Judge.

### I. INTRODUCTION

Plaintiff Albert Fruman commenced this action against the City of Detroit on October 2, 1996 in Wayne County Circuit Court. In his Complaint, Plaintiff alleges that, in demolishing a vacant building he owned, the City violated his procedural due process rights and is liable to him for damages for trespass and inverse condemnation. The property in question is located at the northeast corner of Gratiot and French Roads in the immediate vicinity of the Detroit City Airport. Defendant timely removed the ac-

tion to U.S. District Court on federal question grounds.

This action is presently before the Court on the City's Motions for Summary Judgment.[1] Having reviewed the parties' briefs and supporting documents, the Court has determined that oral argument is not necessary. Therefore, pursuant to Local Rule 7.1(e)(2), this matter will be decided on the briefs. This Opinion and Order sets forth the Court's ruling.

### II. FACTUAL BACKGROUND

Plaintiff Albert Fruman is the owner of a building located at 10533 Gratiot Road, on the corner of Gratiot and French Roads in the City of Detroit (the "Gratiot property"). From 1961 until 1987, Plaintiff operated a metal fabrication business at this location.

Plaintiff claims that in the summer of 1987 the City of Detroit represented to him and his real estate agent that the property would either be purchased or condemned by the City for the expansion of Detroit City Airport. The Detroit City Council had approved a project for the airport expansion in June 1987, and in July of that year the City Building Authority and the City of Detroit entered into a contract for funding the expansion of the airport.

On or about July 11, 1987, Fruman's property was appraised at $227,500.00 by Burton Altman of the City's Community and Economic Development Department ("CEDD"). On September 28, 1987, Mr. Altman sent a letter to George Koulouras, Fruman's real estate agent, offering to purchase the property for $150,000.00. Through his agent, on October 9th Plaintiff presented a counteroffer of $195,000.00 to Mr. Altman. Plaintiff was subsequently directed, sometime in late October 1987, to undertake the drafting of purchase documents for the purpose of review by City's attorney at an agreed upon sales price of $195,000.00.

Relying on these representations of the City's intent to purchase his property, Plain-

---

1. The City filed two motions for summary judgment. The first motion addresses all of the claims asserted in Plaintiff's Complaint. The second motion addresses only Plaintiff's claim of inverse condemnation in Count III.

tiff subsequently relocated his business to 6455 Kingsley Street in Dearborn, Michigan. When he relocated, Plaintiff changed his address on the City's tax roll for the Gratiot property to the Kingsley address, and from 1989 on, all Wayne County and Detroit City tax bills for the Gratiot property were sent to Plaintiff at the Dearborn address.

On January 20, 1988, after he had vacated the Gratiot property, the City sent Fruman a letter informing him that it would not be able to purchase Plaintiff's property because of insufficient funding. Meanwhile, Plaintiff's building on Gratiot remained vacant from the time he moved his business in 1987 until June 14, 1994 when the structure was demolished by the City. The building, despite Plaintiff's attempts to secure it, suffered vandalism and was deemed unsafe by Defendant.

Prior to the building's demolition, from 1989 to 1993, several hearings took place regarding the condition of the property and the City's proposed demolition of it as an unsafe structure. On February 2, 1991, Detroit City Council held a hearing regarding the property's condition at which time it ordered the removal of the structures from the property. Plaintiff however, never received notice of that hearing.

During this same pre-demolition time span, between 1989 and 1993, at least three appraisals and environmental assessments were done by the City, which was attempting to gain funding from the Federal Aviation Agency to purchase properties deemed obstructions to airport airspace. This included Plaintiff's property as part of a "runway protection zone." The appraisals were done by Marcus G. Woodson, Peggy Young & Associates, and Juanada, Inc. The appraisals were as follows: (1) on September 1, 1989, the property was appraised at $180,000.00 using the market value approach to value; (2) on June 22, 1993, the property was appraised at $166,500.00 using the sales comparison approach to value; and (3) on July 9, 1993, the property was appraised at $187,000.00 using the highest and best use approach to value. Prior to these appraisals, in 1987, when talks

first began concerning the City's purchase of the property, the City had also ordered an appraisal to be done by its staff. This appraisal, which was done by using both the market approach to value and the income approach to value, indicated that as of August 28, 1987 the property was valued at $388,000.00 and $315,000.00, respectively.

On November 12, 1993, the City once again made an offer to purchase Plaintiff's property. [See Exhibit C of Defendant's Brief which does not indicate the amount of the offer]. This offer was delivered to Plaintiff at his Dearborn address. Apparently, Plaintiff did not accept the offer.

Despite the City's obvious awareness of Plaintiff's Dearborn address as indicated above, between 1989 and 1992, it sent eight notices of hearings and/or demolition by certified mail, return receipt requested to the vacant 10533 Gratiot address. Plaintiff did not receive any of these notices, nor did the City ever receive any certified mail return receipts acknowledging receipt of the notices by anyone. Not having received any of the notices, Plaintiff was unaware of any hearings concerning his property. On or about June 14, 1994, without notice to Plaintiff, the City demolished Plaintiff's Gratiot property.

On October 3, 1996, Plaintiff initiated this action alleging that the City's actions with respect to the demolition of his building violated his procedural due process rights and entitle him to damages under 42 U.S.C. § 1983. He also alleges state law claims of trespass, inverse condemnation and "de facto taking." [2]

## III. DISCUSSION

### A. STANDARDS APPLICABLE TO MOTIONS FOR SUMMARY JUDGMENT

Summary Judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that

---

**2.** Although presented as separate counts, as discussed *infra*, an inverse condemnation claim is, in effect, a claim of "de facto taking". There-

fore, the Court will treat these two separately captioned counts as one single claim.

the moving party is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(c).

Three 1986 Supreme Court cases—*Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); and *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)—ushered in a "new era" in the standards of review for summary judgment motion. These cases, in the aggregate, lowered the movant's burden on a summary judgment motion.[3] According to the *Celotex* court,

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.

*Celotex*, 477 U.S. at 322

After reviewing the above trilogy, the Sixth Circuit established a series of principles applied to motions for summary judgment. They are summarized as follows:

> * Case involving state of mind issues are not necessarily inappropriate for summary judgment.

> * The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case. This burden may be met by pointing out to the Court that the respondent, having had a sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

> * The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

> * The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.
> * The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is plausible.

*Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir.1989). *See also, Nernberg v. Pearce*, 35 F.3d 247, 249 (6th Cir.1994).

The court will apply the above principles in deciding Defendant's Motions for Summary Judgment in this case.

### B. PLAINTIFF'S SECTION 1983 CLAIM OF VIOLATION OF HIS PROCEDURAL DUE PROCESS RIGHTS

42 U.S.C. § 1983 furnishes a substantive right and civil cause of action for deprivation of one's civil rights, including the right to procedural due process guaranteed under the Fourteenth Amendment:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia subjects, or causes to be subjected, any citizen of the United States or any other person within the jurisdiction thereof to the deprivation of any rights, laws, shall be liable to the party injured in an action at law, suit in equity, or other property proceeding for redress.

Plaintiff contends in this case that his due process rights under the Fourteenth Amendment were violated by Defendant. Due process at the very least requires that a party be provided with notice and a hearing to avoid wrongful deprivation of a property interest. "An essential principle of due process is that a deprivation of life, liberty, or property 'be preceded by notice and opportunity for hearing appropriate to the nature of

---

**3.** "Taken together the three cases signal to the lower courts that summary judgment can be relied upon more so than in the past to weed out frivolous lawsuits and avoid wasteful trials." 10 Charles A. Wright, Arthur R. Miller, Mary Kay

the case.'" *Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985), quoting *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 317, 70 S.Ct. 652, 94 L.Ed. 865 (1950).

Thus, in this case, for the City to succeed with its motion for summary judgment on this claim, it must establish that Plaintiff was given notice of the hearings and was given a full and fair opportunity to be heard by the City to answer any allegations made by the City as to the condition of the property located at 10533 Gratiot and the City's contemplated demolition of the property.

For Plaintiff to succeed in withstanding summary judgment on this claim, he must show (1) that he had no notice or opportunity to be heard; (2) a predeprivation hearing

was practicable; (3) that Defendant's conduct in depriving him of his entitlement to notice and an opportunity to be heard is part of an authorized official action establishing a custom or policy on the part of the municipality, and (4) that Plaintiff was either deprived of his property or liberty due to the Defendant's official conduct. *Parratt v. Taylor,* 451 U.S. 527, 540, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981).

## 1. *NOTICE*

■ The City contends that it provided Fruman with notice of its intent to demolish his building by sending him notices of several hearings by registered mail in accordance with the provisions of City Ordinance No. 12–11–10.1.[4] These registered-letter notices,

Kane, *Federal Practice and Procedure,* § 2727, at 33 (1993 Supp.)

4. The Ordinance in question provides as follows: **Section 12–11–10.1 Vacant Buildings:**
It shall be unlawful for any owner or agent thereof to keep or maintain any building or structure which shall be (1) vacant for more than one year and (2) dilapidated or deteriorated to such a degree that it is economically unfeasible to rehabilitate to conform to the full requirements of the code for new buildings, for any use permitted under the zoning law. A building shall be determined to be economically unfeasible to rehabilitate when the estimated cost of such rehabilitation shall be determined by the city appraiser to be more than the market value of the building if rehabilitated.
(a) Notwithstanding any other provision of this ordinance when any dwelling or structure, having been vacant for more than one (1) year, shall be found to be economically unfeasible to rehabilitate, *the building official shall issue a notice specifying the time and place of a hearing on the condition of such building and directing the owner or owners of record to appear at such hearing before a hearing officer, who shall be appointed by the building official, and show cause why the building or structure should not be demolished. All notices shall be in writing and shall be served upon the person to whom they are directed personally, or upon his authorized agent, or when personal service is not feasible, notice shall be sent by registered or certified mail to the last known address of such owner or owners, return receipt requested, at least ten (10) days before the date of the hearing described in the notice. If none of these parties can be found after a diligent search, the notice shall be posted upon a conspicuous part of the building or structure. The failure of an owner or owners to receive notice duly mailed shall not affect in any manner the validity of any proceedings against the property hereunder.*

(b) The hearing officer shall take testimony of the building inspector, the city appraiser, the owner or owners and any interested party. The hearing officer shall then render his decision either closing the proceedings or ordering the building or structure to be demolished. A copy of the findings and order of the hearing officer shall be served on the owner or his authorized agent in the manner, prescribed in Section 12–11–10.1(a). When it is determined at the hearing that the building or structure should be demolished, and the owner has failed to appear, or thereafter neglects or refuses to act within the time fixed by the hearing officer, the hearing officer shall file a report of his findings with the City Council and request that the building or structure be ordered demolished. The City Council shall hold a hearing where it will either approve, disapprove, or modify the request for demolition. In reaching its decision, the City Council shall consider any evidence of the historic significance of the building or structure, and its qualification for designation as an historic landmark or inclusion in an historic district, as provided in Chapter 2, Article VI of the Detroit Municipal Code. The owner or owners of record shall be notified as provided in Section 12–11–10.1(a) of the date and place of hearing before the City Council where they shall be given the opportunity to show cause why their building or structure should not be demolished. When it is determined at the hearing before the City Council that the building or structure should be demolished, and the owner or owner fails to appear or has refused to act within the time specified, the building or structure shall be demolished by the city. The city shall not demolish any building or structure until the expiration of twenty (20) days after entry of the City Council's order of demolition. The cost of demolition, including administration costs, shall be charged to the owner or owners in the following manner:
(I) The costs of demolition shall be a lien against the real property and shall be reported to

however, were sent to Fruman at the vacant Gratiot building. The City never received any acknowledgment of Plaintiff's receipt of the notices. Indeed, one of Defendant's own exhibits shows that at least one of the notices was returned to the City as unanswerable with a notation by the Post Office that the addressee, i.e. Fruman, had moved. Furthermore, in light of several pieces of correspondence and, most notably, the recordation on City tax rolls for more than five years of Plaintiff's Dearborn business address, at 6455 Kingsley, for the purpose of assessing taxes for the vacant Gratiot property, the adequacy of the City's provision of notice of Plaintiff is seriously flawed. The City taxes had all been billed to Plaintiff's Dearborn address and fully paid at the time of the demolition of the property, thus confirming the City's knowledge of that Fruman's "last known address" was the Dearborn address, not the address of vacant Gratiot building. Moreover, during this pre-demolition period, the City directed correspondence concerning its offer to purchase the property to the Dearborn address. This further evidences that the City knew Plaintiff's address was 6455 Kingsley, Dearborn, Michigan.

■ Furthermore, the Ordinance requires that the City make a "diligent search" for the property owner prior to taking action against the property adverse to the owner's interest. The City did not comply with this requirement of the Ordinance, either. Its "efforts" to notify Plaintiff of the hearing on the demolition of the Gratiot property simply consisted of sending eight unacknowledged notices to the vacant building. This does not meet the "diligent search" requirement of the notice and hearing procedure provided in Ordinance 12–11–10.1. Indeed, the City apparently made no effort to "search" for Plaintiff to provide him notice of the demolition hearing. Had it made any effort at all it would have easily located him as evidenced by the fact that when it wanted to make an offer to

the Board of Assessors who shall assess the cost against the property in question. The lien shall be enforced in the in the manner prescribed in the manner prescribed in the Carter or the Code of the City of Detroit, providing for the enforcement of special assessment liens or tax liens.

purchase the property, it mailed the offers to purchase to Plaintiff at the Kingsley address.

Moreover, to the extent that the City contends that its demolition of Plaintiff's building was lawful under the Ordinance because Plaintiff could not be located, there is no evidence that the City "conspicuously posted" any of the notices on the Gratiot building as provided in the Ordinance. A governmental agency is bound to observe its own regulations, and denies due process if it does not. *Superior Savings Ass'n v. City of Cleveland*, 501 F.Supp. 1244, 1249 (N.D.Ohio 1980), quoting *Service v. Dulles*, 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957).

This history, taken cumulatively, requires this Court to find, as a matter of law, that the City failed to provide Plaintiff adequate notice.

## 2. *AUTHORIZED OFFICIAL ACTION*

■ Relying on *Yates v. Jamison*, 782 F.2d 1182 (4th Cir.1986), and its construction of *Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), and *Hudson v. Palmer*, 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984), the City argues that it cannot be held liable for the violation of Plaintiff's due process rights. Defendant appears to take the position that any failure to exercise due diligence in ascertaining Plaintiff's address at best would amount to negligence, which under *Parratt, Palmer,* and *Yates* would not establish a violation of procedural due process because under state law, Plaintiff has a post-deprivation remedy—a right to sue for inverse condemnation.

In *Yates*, the plaintiffs sued the individual members of the City Council of Charlotte, North Carolina who had directed the building superintendent to demolish their building after an inspection revealed that it was not fit for inhabitation. The building was demolished without notice to the plaintiffs. The court determined that the plaintiffs had no procedural due process claim, explaining:

(ii) If any tax assessment pursuant to this action is found to be unjust or erroneous, or where the owner of the property would suffer an undue hardship through no fault of his own, the City Council may waive the assessment.

*Parratt* and *Palmer* established the rule that a government official's random and unauthorized act, whether intentional or negligent, which causes the loss of private property is not a violation of procedural due process when the state provides meaningful post deprivation remedy. The rationale is that because the wrongful act is not sanctioned by any established procedure, and because state law provides a means for the plaintiff to be made whole for his loss occasioned by the wrongful act, there has been no denial of procedural due process because the state action is not necessarily complete until the termination of the state's postdeprivation remedy.

782 F.2d at 1184.

Defendant here argues that *Yates* stands for the proposition that whenever a post-deprivation remedy is available to a plaintiff, no claim for procedural due process violation will lie. This is not what *Yates* stands for. In making this argument, Defendant ignores the fact that in *Yates,* the plaintiffs admitted that they were not challenging the operation of the state statute or the city ordinance which required notice and a hearing prior to the demolition of a dwelling. ("[Plaintiffs] do not challenge the operation of the North Carolina statute or the Charlotte ordinance which require notice and a hearing prior to the demolition of a dwelling." *Id.* at 1185.) They only challenged the conduct of individual city officials as being "willfully and recklessly negligent." *Id.*

By contrast, this is a case *not* against individuals charged as being negligent. Rather, it is against the municipality itself and the validity of the city's own policy as set forth in the City Ordinance. As the Supreme Court made clear in *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), when the injury sustained by the plaintiff is caused by the execution of a local government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, the governmental entity may be held responsible under § 1983. *Id.* 436 U.S. at 694. *See also, Pembaur v. Cincinnati,* 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986) (where a deliberate course of action is made by officials responsible for establishing a municipality's final policy with respect to the subject matter in question, the municipality is responsible.)

This action is aimed at the City of Detroit which, in its execution of its own governmental policy as explicitly adopted by the City Council, its governing body, authorized the demolition of Plaintiff's property. The City Council authorized and ordered that the building be torn down, but has failed to establish that it provided Plaintiff with effective notice of its intentions despite its "knowledge" of the location of Plaintiff's current business operations at the time.

Moreover, even the *Yates* court acknowledged that a plaintiff can make out a claim of violation of due process if he can show that the procedure afforded by the governmental policy itself deprived him of due process. *Id.* at 1185. Plaintiff in this case has shown just that.

■ What constitutes a "diligent search" is not delineated in the Ordinance. If the requirements for a "diligent" search are not delineated, the municipality is free to deprive Plaintiff of both notice and a hearing. A procedure that is not specific as to what steps are necessary to effect a "diligent search" is, therefore, bereft and lacking for the purposes of due process. Not only has the City failed to establish that it made an effort to find the Plaintiff, but more importantly, it ignored the return of its notices without acknowledgment of receipt by the Plaintiff, including those notices returned with the postal service's notation that the addressee, Fruman, had moved.

■ Even more troublesome than the Ordinance's lack of delineation of what constitutes a "diligent search" is the clause which states, "The failure of an owner or owners to receive notice duly mailed shall not affect in any manner the validity of any proceedings against the property hereunder." This clause effectively allows the City to proceed without providing notice to the property owner. Nothing in it requires that the property owner *receive* "notice duly mailed." Where, as here, certified registered mail, "return

receipt requested" is a substitute for personal service, if no return slips acknowledge Plaintiff's receipt of the notices, the mailings cannot withstand due process scrutiny upon merely being "duly mailed" where the City itself can be held to have knowledge of the owner's whereabouts.

### 3. THE ADEQUACY OF A POSTDEPRIVATION REMEDY

■ Under *Parratt*, "postdeprivation remedies made available by the State can satisfy the Due Process Clause." However, the Supreme Court emphasized in that case that it was dealing with "a tortious loss of ... property *as a result of a random and unauthorized act by a state employee ... not a result of some established state procedure.*" 451 U.S. at 541. Thus, the existence of postdeprivation remedies will not satisfy due process concerns in all cases. It is true that the *Parratt* Court did observe that several cases "recognize that either the necessity of quick action by the State or the impracticability of providing any meaningful predeprivation process, when coupled with the availability of some meaningful means by which to assess the propriety of the State's action at some time after the initial taking, can satisfy the requirements of procedural due process." *Id.* 451 U.S. at 540 n. 4, citing *Arnett v. Kennedy,* 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974). In this case, however, there is no evidence of a "necessity of quick action" or of "the impracticability of providing any meaningful predeprivation process." Further, Plaintiff has not been provided with any postdeprivation hearing.

■ Moreover, as Plaintiff points out, in *Zinermon v. Burch,* 494 U.S. 113, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990), the Supreme Court expressly held that "[i]n situations where the State feasibly can provide a predeprivation hearing before taking property, it generally must do so *regardless of the adequacy of a postdeprivation tort remedy to compensate for the taking.*" *Id.* 494 U.S. at 134. *See also Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982), (where state actors are following established state procedures that result in the deprivation of an individual's property,

ordinarily the existence of postdeprivation remedies is irrelevant. In such cases the general due process requirements of prior notice and opportunity to be heard apply); *Watts v. Burkhart,* 854 F.2d 839 (6th Cir. 1988) (where a deprivation is caused by application of established state procedures, the existence of adequate postdeprivation procedures is irrelevant. *Id.* at 843).

The Court finds that in this case, Plaintiff has properly presented affirmative evidence establishing that he lacked notice and an opportunity to be heard. The record evidence further establishes that the Defendant's conduct was an authorized official action and that a predeprivation hearing was practicable in the sense that procedure for such hearings are implemented by the City's own Ordinance, City ordinance 290–H, §§ 12–11–10.0 and 12–11–10.1. Finally, contrary to the City's contention, as the Supreme Court held in *Zinermon,* regardless of any post-deprivation tort remedy that might be available to Plaintiff, because a predeprivation hearing was feasible, the fact that Michigan law affords a postdeprivation remedy for inverse condemnation is irrelevant.

■ For all of the foregoing reasons, Defendant's Motion for Summary Judgment on Plaintiff's § 1983 Violation of Due Process claim will be denied. However, where, as here, the material facts have been fully developed by the evidence presented by the parties and they establish that non-moving party—in this case, the Plaintiff—is clearly entitled to judgment as a matter of law, summary judgment may be appropriately entered in his favor notwithstanding the fact that no cross-motion for summary judgment has been filed. *Dickeson v. Quarberg,* 844 F.2d 1435, 1444–45 n. 8 (10th Cir.1988). *See also Township of Benton v. County of Berrien,* 570 F.2d 114, 119 (6th Cir.1978); *Coach Leatherware Co. v. AnnTaylor, Inc.,* 933 F.2d 162, 167 (2nd Cir.1991); *McCarty v. United States,* 929 F.2d 1085, 1088 (5th Cir. 1991); *Merrell v. Bay County Metropolitan Transportation Authority,* 707 F.Supp. 289, 295 (E.D.Mich.1989); *EEOC v. Allendale Nursing Centre,* 996 F.Supp. 712 (W.D.Mich. 1998) ("If after reviewing the motion of the moving party, a court finds that there are no

genuine issues of material fact, and the law is on the side of the non-moving party, the court may grant summary judgment in favor of the non-moving party.")

The Court finds that in this case there are no genuine issues of material fact and Plaintiff is entitled to judgment as a matter of law on his Section 1983 claim of violation of procedural due process. Therefore, summary judgment will be entered in Plaintiff's favor on this claim.

### STATE LAW CLAIMS

### (1) PROCEDURAL DUE PROCESS UNDER ARTICLE 1, § 17 OF THE MICHIGAN CONSTITUTION

With regard to Plaintiff's claim of violation of due process rights protected by the Michigan State Constitution, however, the Court concludes that Defendant's Motion for Summary Judgment should be granted.

■ Recently, the Michigan Court of Appeals expressly determined that regardless of whether the conduct complained of occurred by virtue of a custom or policy, claims of violation of rights protected by the Michigan Constitution are not appropriate where *a municipality or a municipal employee* is the alleged wrongdoer; such claims are only appropriate in the context of alleged wrongdoing by the State or a state employee sued in his official capacity. *Jones v. City of Detroit,* 227 Mich.App. 662, 577 N.W.2d 130 (1998).

Because the Defendant in this case is a municipality, in light of the *Jones* decision, Defendant's Motion for Summary Judgment will be granted on Plaintiff's claim of violation due process rights under the Michigan Constitution.

### (2) TRESPASS

■ In Michigan, trespass has been defined to be any unauthorized intrusion or invasion of the private premises or lands of another. *Giddings v. Rogalewski,* 192 Mich. 319, 158 N.W. 951 (1916); *Douglas v. Bergland,* 216 Mich. 380, 185 N.W. 819 (1921). *See also, Antkiewicz v. Motorists Mutual Ins. Co.,* 91 Mich.App. 389, 396, 283 N.W.2d 749, 753 (1979), *vacated on other grounds,* 407 Mich. 936, 285 N.W.2d 659 (1979).

The City contends that it is entitled to summary judgment on Plaintiff's trespass claim because its entry (and demolition of the property) was authorized by the City Ordinance. Since its actions were "authorized" under the Ordinance, the City argues, there can be no "trespass", as a matter of law.

While it is true that normally, a public officer who is on the premises of another pursuant to legal authorization is not liable for trespass, *Antkiewicz, supra;* 87 C.J.S. Trespass § 54, as discussed above, the Court has determined that the City did not comply with its own Ordinance before it demolished Plaintiff's property. It did not send any notice of the demolition to Plaintiff "at his last known address" before taking action, it did not perform a "diligent search" to ascertain Plaintiff's whereabouts, and it did not post any of its notices. Therefore, Defendant's demolition of Plaintiff's property was not authorized under the Ordinance.

Therefore, the City is not entitled to summary judgment on the merits of this claim.

■ The City also cursorily argues that under Michigan's Governmental Immunity Statute, M.C.L. § 691.1407, it is immune from liability for trespass. It is true that Section 1407(1) does provide broad immunity for governmental agencies (the definition of which in § 690.1401 includes "municipalities"):

Sec. 7. (1) Except as otherwise provided in this act, all governmental agencies shall be immune from tort liability in all cases wherein the government agency is engaged in the exercise or discharge of a governmental function. *Except as otherwise proved in this act, this act shall not be construed as modifying or restricting the immunity of the state from tort liability as it existed before July 1, 1965, which immunity is affirmed.*

691.1407(1).

However, in *Hadfield v. Oakland County Drain Commissioner,* 430 Mich. 139, 422 N.W.2d 205 (1988), the Michigan Supreme Court determined that this broad immunity did not apply to claims of trespass. In reaching that conclusion, the Court examined

the state of the law of governmental immunity as it existed prior to July 1, 1965, and found that trespass claims, particularly those involving "takings" issues, were traditionally treated as exceptions to the governmental immunity defense. The *Hadfield* Court concluded, that in light of the strong treatment of trespass as an exception to governmental immunity prior to 1964, the Legislature must have intended, through the language of the second sentence of subsection (1) of the act to preserve the exception in its established form. 422 N.W.2d at 219.

*Hadfield* makes clear that there is no merit to Defendant's "governmental immunity" argument.

For these reasons, Defendant's motion for summary judgment will be denied on this claim. However, as with Plaintiff's federal due process claim, *supra*, the Court finds that there is no material factual dispute as to this claim, and as a matter of law, the Court finds that Plaintiff is entitled to entry of a summary judgment of liability on this claim.

### (3) *INVERSE CONDEMNATION/"DE FACTO TAKING"*

The City also contends that Plaintiff has not made out a claim of inverse condemnation, or "de facto taking", because, in demolishing Plaintiff's building, the City was acting pursuant to its police power to remove unsafe and dangerous structures and not pursuant to its eminent domain powers. Further, the City claims the intent of the City was not to take the property, but rather, to insure the public health, safety and welfare by removing a dangerous structure which the City claims was abandoned in 1987 by Plaintiff who subsequently allowed the structure to deteriorate to a "horrid" condition. Therefore, the City argues that no "taking" occurred which would entitle Plaintiff to just compensation.

**5.** Moreover, none of the cases relied upon by the City for this proposition are "takings" cases. *Blue Cross/Blue Shield of Michigan v. Milliken,* 422 Mich. 1, 367 N.W.2d 1 (1985), involved the issue of constitutionality of the Nonprofit Health Care Corporation Reform Act. *People v. Raub,* 9 Mich.App. 114, 155 N.W.2d 878 (1967), concerned the issue of whether a City Ordinance limiting the time a business may operate violates the equal protection of the law and is within the exercise of a City's police power. *Wyant v. Di-*

#### a. *The Question of Taking: Eminent Domain or Police Power*

█ As an initial matter, the Court notes that under established Michigan law, the City's claim that it was acting under its "police power" and not its "eminent domain power" is irrelevant: [5]

> In some situations, the government's actions with respect to a particular property have an impact which deprives an owner of the practical benefits ... of the property. In such a case ... the government's actions [may] constitute a 'taking' of the property.... This does not mean that the government has actually seized or confiscated the property, but merely that **the impact of the government's actions on the property is such that the law treats the situation as though a taking has occurred.**

Michigan SJI 2d 90.14 (emphasis added).

█ Although it is true that acting under its police powers a state (or local government) may regulate uses of property without compensation, the United States Supreme Court has delineated at least two categories of regulatory action that are compensable regardless of the public interest advanced in support of the restraint. The first encompasses regulations that compel the property owner to suffer a physical "invasion" of his property. In general, "no matter how minute the intrusion, and no matter how weighty the public purpose behind it, [the Supreme Court has] required compensation." *See Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 112 S.Ct. 2886, 2893, 120 L.Ed.2d 798 (1992). The second situation in which the Court has found regulatory action to require compensation to the landowner is "where regulation denies all economically

*rector of Agriculture,* 340 Mich. 602, 66 N.W.2d 240 (1954), dealt with the issue of whether a statute designed to prevent the spread of bee disease was in the interest of public health and was a valid exercise of police power. *Brady v. Northwestern Ins. Co.,* 11 Mich. 425 (1863), involved an issue of damages concerning an insurance policy for a wood building destroyed by fire where a City Ordinance places limitations on what can be repaired.

beneficial or productive use" of the property. *Id.*

█ In this case, the evidence is abundant that Plaintiff suffered the ultimate invasion of his property—it was destroyed. Furthermore, Plaintiff has presented evidence establishing that the condition of the property which the City contends entitled it to act under its "police power" to demolish was actually caused by the City. The evidence shows that Plaintiff vacated the property in 1987 in reliance upon representations from the City that it was ready to go forward with the purchase of his property for $195,000.00 in connection with its plans to expand Detroit City Airport. The City directed him to obtain Title Insurance insuring the City (which Plaintiff did), and further directed him to have all of the appropriate sales and title documents drawn up and submitted to its legal department. Plaintiff complied with all of the City's requests and vacated the property at his own expense near the end of 1987. No evidence contradicting Plaintiff's evidence has been presented. Thus, it was at the instigation of the City that Plaintiff moved his business and left his Gratiot building vacant.

In January of 1988, however, the City informed Plaintiff that it did not have the financial resources to go through with the purchase of his property as contemplated. This left the Plaintiff with a vacant building located in an area where the probability of vandalism for unoccupied structures is significant. Even though Defendant informed Plaintiff of a lack of funds in January of 1988, evidence submitted by Plaintiff nevertheless establishes that negotiations concerning the City's purchase of the property continued at least through 1989 and the City continued to have appraisals of the property done through 1993 for the stated purpose of purchasing the property as part of a "runway protection zone." The City's own evidence establishes that in late January 1990, three to four months after it had an appraisal done which showed a substantial decrease in market value of the property as compared to its 1987 appraisals, the City began its actions with respect to demolition of Plaintiff's building.

The City now claims that it does not have to compensate Plaintiff for demolishing his building because it was acting under its police powers to insure the public safety and health and demolished Plaintiff's building because he left it vacant and subject to vandalism and decay.

While under normal circumstances, the Court might be inclined to agree with the City that it is a proper exercise of police power to raze vacant, abandoned, and dilapidated buildings that become health and safety hazards, this is not one of those cases. Here, the building was not "abandoned" by Plaintiff, as the City contends. Rather, Plaintiff vacated the building in reliance upon the City's agreement to purchase it. After Plaintiff vacated the property and relocated his business, the City reneged on its offer to purchase. The building, now vacant, according to the City, deteriorated to a "horrid" condition, and became unsafe. The value of the property also accordingly diminished. It is clear to the Court that but for the City's actions with respect to the offer to purchase the property, Plaintiff's property would not have become vacant, and would not have become subject to demolition under Ordinance 290–H.

Given these circumstances, the Court cannot say that the City was merely acting under its police powers "to insure the health, safety and welfare of the public" in demolishing the building. Indeed, this police powers argument is belied by the City's own evidence that for a number of years prior to the demolition of Plaintiff's property it sought to purchase the property *for airport expansion.* [See Plaintiff's initial Brief, Ex. C.] The City cannot now hide behind the cloak of acting under its police powers to abate a public safety hazard.

#### b. *Requirements for a "Taking;" Inverse Condemnation Defined*

█ Inverse condemnation is an action to recover the value of property taken by a governmental defendant for public use, without the commencement of eminent domain proceedings. *Hart v. City of Detroit,* 416 Mich. 488, 494, 331 N.W.2d 438 (1982). *See*

also, *Acquisition of Virginia Park*, 121 Mich. App. 153, 158–59, 328 N.W.2d 602 (1982).

To establish a claim of inverse condemnation, a plaintiff must establish the following:

1) that the governmental entity intended to acquire a particular piece of property for public use;

2) that the acquisition of the property was intended to be accomplished at a price below the fair market value;

3) that the governmental entity engaged in severe and deliberate actions calculated to destroy the value of the particular property;

4) that the government's deliberate actions were done with the purpose of destroying the value of the property and to facilitate acquisition; and

5) that the destruction of the value occurred, such destruction being caused by the intentional abuse of the power of eminent domain.

*In re Urban Renewal, Elmwood Park*, 376 Mich. 311, 136 N.W.2d 896 (1965).

As stated in *Hart, supra*, "In an inverse condemnation action ... the plaintiff must prove that the condemnor's actions were of such a degree that a taking occurred." 426 Mich. at 500–501, 396 N.W.2d 373. "Whether a 'taking' occurs for which compensation is due depends on the facts and circumstances of each case." *Id.*

In *Foster v. City of Detroit*, 254 F.Supp. 655 (E.D.Mich.1966), the Court delineated a number of actions which may reflect a taking by a city. These include: 1) sending letters to tenants advising of impending condemnation; 2) intense building department inspection and citations against property owners for violations of the building code; 3) razing of vacant and vandalized buildings; 4) disallowing permits for improvements; and 5) filing lis pendens. *Id.*

In this case, Plaintiff asserts six bases for finding that the property was "taken" by way of inverse condemnation. They are:

1. Widespread publicizing of plans to expand the Detroit City Airport;

2. Application for federal assistance showing Plaintiff's property, valued at $200,000.00, as one of eight properties to be acquired;

3. Representations made by City employees that Plaintiff's property would be acquired;

4. Drafting of Detroit City Airport Master Plans showing Plaintiff's property to be removed;

5. Vacancy of building caused by Defendant's actions resulting in vandalism and subsequent demolition; and

6. Piecemeal condemnation of surrounding properties.

Defendant does not dispute the occurrence of these acts, but rather argues that nothing the City did substantially contributed to the property's decline in value. In support of its argument, the City relies on *Heinrich v. City of Detroit*, 90 Mich.App. 692, 282 N.W.2d 448 (1979). Defendant's reliance on that case is misplaced. In *Heinrich*, the plaintiff brought an action against the City of Detroit for inverse condemnation. The plaintiff claimed that various acts by the City for its urban renewal project adversely affected his property by hampering his ability to rent it out and, thus, amounted to a de facto taking. The court ruled that "while the threatened condemnation may have hindered plaintiff's ability to rent the building, he had failed to establish that the city's actions—as opposed to the general area blight and the destruction **caused by the 1967 riots**—were *the* or even the greater cause of this inability." *Heinrich*, 90 Mich.App. at 697, 282 N.W.2d 448. (some emphasis added). The court, therefore, concluded that no de facto taking occurred.

Unlike *Heinrich* where the court determined that it was the 1967 riots that substantially contributed to the blight and destruction of the area in which the plaintiff's property was located and also likely caused plaintiff's inability to rent his property, no such superseding or intervening cause is shown in this case. Furthermore, in this case, the proposed runway expansion project—a clear "public use"—quite obviously reduced the use and value of Plaintiff's property.

Moreover, the *Heinrich* court made clear that, "the totality of the acts alleged" must be examined to determine whether a "taking" occurred. In this case the plaintiff has presented evidence which shows that he was contacted by the City with an offer to purchase being extended, and his counter-offer having been ostensibly accepted. The City also directed Plaintiff to obtain Title Insurance, insuring the City (which Plaintiff did), and further directed him to have all of the appropriate sales and title documents drawn up and submitted to its legal department. Defendant attempts to argue that its acceptance of Plaintiff's counter-offer was "contingent upon federal funding." However, there is no mention of this contingency in any of the correspondence between the City and Plaintiff prior to Plaintiff's vacating of the premises.

Defendant also asserts that Plaintiff himself is responsible for his property not being purchased because he failed to respond to the offer dated November 12, 1993. However, even though the value of this offer is not presented or discernable from the evidence submitted by either side, given the fact that once Plaintiff vacated the property, as the years progressed, each appraisal of the property showed a marked decrease in value, it is reasonable to infer that the 1993 offer was for substantially less than what Plaintiff was willing to go forward with in 1987. As the court in *Foster* held, it would not be fair to have the owner bear the cost of the depreciation when the depreciation was substantially caused by the acquiring entity's actions. *Foster*, 254 F.Supp. at 664.

The City also argues that no taking has occurred because Plaintiff retains title to the (now vacant) property. "It is well-settled in Michigan law that a 'taking' of private property for public use may occur without absolute conversion of the property in question. It includes ... '[c]ases where the *value is destroyed by the action of the government itself, or exclusion of the owner from its enjoyment, or from any of the appurtenances thereto.* In either of these cases it is a taking within the meaning of the provision of the Constitution.'" *Heinrich*, 90 Mich.

App. at 697, 282 N.W.2d 448 (citations omitted and emphasis added).

*Heinrich* adopted the rule set forth in *Foster v. City of Detroit, supra*, that a plaintiff may recover in inverse condemnation where "the actions of the defendant ... *substantially contributed to* and accelerated the decline in value of plaintiff's property." *Heinrich*, 90 Mich.App. at 700, 282 N.W.2d 448 (quoting *Foster*, 254 F.Supp. at 662). Thus, a plaintiff may prove his case by showing that "the government's actions were a substantial cause of the decline of the property's value ... [and that] the government abused its legitimate powers in affirmative actions directly aimed at the plaintiff's property." *Id.*

Here, Plaintiff has offered compelling evidence that he relied on the actions of the City, which he reasonably believed established acceptance of his counter-offer, in deciding to relocate in 1987, leaving the Gratiot property vacant, including directing Plaintiff to have the appropriate sales and title documents drawn up and submitted to the City attorney, and directing him to obtain Title Insurance insuring the City. Although evidence has been presented that the City subsequently informed Plaintiff in January 1988 that it did not have sufficient funds to go through with the deal, Plaintiff has presented evidence showing that Defendant, nonetheless, thereafter continued to conduct appraisals on the property through 1993 for the purpose of obtaining (and demolishing) the property to create a "runway protection zone" for the airport.

Viewing the totality of the evidence presented, the Court finds that Plaintiff has submitted sufficient evidence of a "taking" by the City to withstand Defendant's motion for summary judgment. Although Defendant contends the Plaintiff has failed to demonstrate that the property in question was taken for a public purpose and that the City of Detroit was the substantial cause of the property's decline in value, Plaintiff has submitted evidence (which the City has not contradicted) which shows that Plaintiff's property was taken for a public purpose (the establishment of a "runway protection zone"). Plaintiff further has shown a connection be-

tween the property's decline and the City's actions in inducing him to vacate the property.

■ Given the fact that the evidence presented by Plaintiff is uncontradicted and that the City's arguments are just that—bare arguments and factually unsupported contentions—the Court finds that summary judgment (as to liability) should be entered in favor of Plaintiff.[6]

### CONCLUSION

For all of the foregoing reasons,

IT IS HEREBY ORDERED that the Defendant's Motion for Summary Judgment be, and hereby is granted in part, and denied in part. Defendant's Motion is GRANTED with respect to Plaintiff's claim of deprivation of rights protected by the Michigan Constitution. With respect to all of Plaintiff's other claims, however, Defendant's Motion is DENIED.

With respect to Plaintiff's Section 1983 federal claim of violation of procedural due process, as well as his state law claims of trespass and de facto taking/inverse condemnation, SUMMARY JUDGMENT, AS TO LIABILITY, is hereby entered IN FAVOR OF THE PLAINTIFF and against Defendant City of Detroit.

This case, accordingly, will proceed to trial on the issue of Plaintiff's damages.

SO ORDERED.

---

6. In its Reply Brief, the City also raises one additional argument—that Plaintiff's inverse condemnation claim is time-barred. Defendant contends that the statute of limitations for inverse condemnation actions is the general "all other personal actions" six-year statute of limitations provided in M.C.L. § 600.5813. However, the Michigan courts have determined that where a plaintiff retains ownership rights in the property which he claims has been de facto taken, the appropriate statute of limitations is the 15–year period applicable to real property actions provid-

ed in M.C.L. § 600.5801(4). See, Difronzo v. Port Sanilac, 166 Mich.App. 148, 153–154, 419 N.W.2d 756 (1988). See also, Hart v. City of Detroit, 416 Mich. 488, 499 331 N.W.2d 438 (1982) ("We do not foreclose the possibility that on the proper facts, where a plaintiff retains ownership rights in the property when suit is brought, the analogy to adverse possession may be applied.")

There is no question in this case that Plaintiff's suit was timely filed under this 15–year statute.