**Michael H. ANTONIAN and Jeanette C. Antonian, Plaintiffs,**

v.

**CITY OF DEARBORN HEIGHTS and City of Dearborn Heights Demolition Board of Appeals, Defendants.**

**No. 01–CV–71658–DT.**

United States District Court, E.D. Michigan, Southern Division.

Sept. 26, 2002.

---

William E. Hosler, Birmingham, MI, John W. Griffin, Jr., Birmingham, MI, for Plaintiffs.

Edward E. Salah, Livonia, MI, for Defendant.

## OPINION AND ORDER REGARDING THE PARTIES' CROSS–MOTIONS FOR SUMMARY JUDGMENT

ROSEN, District Judge.

### I. INTRODUCTION

This Section 1983 denial of due process action arises out of the November 9, 1999 demolition of property located at 26149 Hanover in the City of Dearborn Heights. Plaintiffs Michael and Jeanette Antonian are the owners of the subject property. Following the close of discovery, the parties cross-moved for summary judgment. The Court heard oral argument on these motions on May 2, 2002, and at the close of the hearing, the Court ordered supplemental briefing on two issues: (1) whether the terms of the City of Dearborn Heights "Bid Sheet" constitute a municipal "policy" or "custom" and (2) whether Dearborn Heights Building Inspector Ken LaMontagne was a "final decisionmaker" and whether he was acting pursuant to proper authority when he issued the notice to the demolition contractor to proceed with the demolition prior to the expiration of the 20–day appeal period provided in the City Code. The parties have complied with the Court's order and have each filed post-hearing briefs addressing these issues.

Having reviewed and considered the parties' motions, briefs and supporting documents, and having further considered the oral arguments of counsel, the Court is now prepared to rule on this matter. This Opinion and Order sets forth the Court's ruling.

## II. *PERTINENT FACTS*

In May 1998, acting on a request from the Dearborn Heights Police Department, employees of the Dearborn Heights Department of Building and Engineering inspected an abandoned house located at 26149 Hanover Street.[1] The inspection of the property revealed that the kitchen, bathroom and laundry rooms had been gutted, debris covered the floors, and there was no running water or heat in the house. Additionally, as noted, the remnants of a marijuana growing operation were found in a second-floor bedroom. In addition to grow lights and fans and other drug paraphernalia, bags of opened top soil were found strewn on the floor and dried up marijuana plants were found in pots thrown around the room. The grounds surrounding the residence had also fallen into blighted condition—the grass was not cut, a fence surrounding the property had fallen down and an abandoned car was in the dilapidated garage.

Following the inspection, the house was boarded up as a security measure and, on June 10, 1998, Building Inspector Kenneth LaMontagne sent a condemnation notification to Paul Ward, who according to Dearborn Heights records, was the record owner of the property, and to Standard Federal Bank, the record mortgagee. [*See* Defendants' Ex. 4 and 9.] The condemnation notice also notified Mr. Ward and Standard Federal of the City's intent to demolish the property unless an appeal was filed within 30 days with the Building Department. *Id.* at Ex. 4.

According to Defendants, no appeal was filed by Ward nor had they had any communication from him. However, in September 1998, the City received a fax from "an unknown source" indicating that the property had been sold by land contract to Jason M. D'Herin by one Jeanette Antonian. As a result of this new information, on September 17, 1998, Building Inspector LaMontagne sent a letter to D'Herin notifying him of the intent to condemn and demolish the property. [*See* Defendants' Ex. 5.]

Mr. D'Herin immediately filed an appeal and application for a hearing before the Demolition Board of Appeals on September 18, 1998. In connection with D'Herin's appeal, Building Director, Edward Opalewski, submitted to the Demolition Board of Appeals a 128–item inspection "punch list" of repairs needed and suggested renovations on the house. [*See* Defendants' Ex. 7.] In Mr. Opalewski's opinion, the house was salvageable, but the required repairs to would cost approximately $40,000. *Id. See also*, Opalewski Dep., Defendants' Ex. 3, p. 11.

On October 6, 1998, the Demolition Board of Appeals heard Mr. D'Herin's appeal. [*See* Defendants' Ex. 8.] Mr. D'Herin acknowledged his receipt of Mr. Opalewski's inspection list and stated his desire to completely remodel the house and sell it. *Id.* The Board voted to give D'Herin 90 days to make substantial improvement on the property and to pull the necessary permits for the repairs within 15 days of the hearing. *Id.* The decision on demolition of the property was accordingly adjourned until January 1999.

Mr. D'Herin never pulled any permits and was never heard from again by the City. At some point in time in mid-December 1998, D'Herin telephoned Plaintiff Michael Antonian, who along with his wife, Jeanette, held title to the house,[2] and noti-

---

1. The police had discovered a marijuana growing operation on the second floor of the vacant house and, apparently, because they found the house to be in poor condition, re- quested the Building and Engineering Department to inspect it.

2. The records submitted by Plaintiffs show that the Antonians together with another mar-

fied Mr. Antonian that he was going to forfeit the land contract and let the property revert back to the Antonians. [*See* Antonian Dep., Plaintiffs' Response Ex. A, p. 13.] D'Herin then told Mr. Antonian that he should "get down to the City [Hall] right away because they're going to be tearing [the house] down." *Id.*

Upon contacting the City, Mr. Antonian learned that a demolition hearing was scheduled for February 2, 1999. Therefore, on December 29, 1998, Antonian filed his own appeal requesting a hearing before the Demolition Board of Appeals. *See* Defendants' Ex. 9.

Mr. Antonian appeared, with counsel, before the Demolition Board of Appeals on February 2, 1999. At that hearing, Mr. Antonian requested that he be allowed 8 to 12 months to rehabilitate the property. *See* Defendants' Ex. 12. The Board refused to allow that long a period of time. *Id.* However, the Board did vote to give Mr. Antonian 60 days to pull the appropriate permits and commence work on the property and show some "noticeable changes and obvious work being done." *Id.* The Board then set the matter over for further review in June 1999. *Id.*

Meanwhile, the Antonians commenced forfeiture proceedings against Jason D'Herin so that they could regain legal possession of the property. A Judgment in the forfeiture action was entered on March 11, 1999. However, because of D'Herin's statutory right of redemption, the Antonians were not yet entitled to re-enter and repossess the property. Therefore, when the Demolition Board of Appeals re-convened on this matter on June 1, 1999, the Board voted to give Mr. Antonian until July 1, 1999 to pull the necessary permits and until October 5, 1999 to complete work needed to obtain a Certificate of Occupancy. [*See* Defendants' Ex. 14.]

On November 3, 1999, the Board of Demolition Appeals convened another hearing on the Hanover Street property. At this hearing, Mr. Antonian indicated to the Board that he had an offer to purchase the property and the purchaser was obtaining HUD financing to complete all necessary repairs required by the City and that he had done some work on the property in an effort "to make the neighborhood look better." [*See* Defendants' Ex. 15.]

Building Inspector Kenneth LaMontagne,[3] however, presented the Board with

---

ried couple, Richard and Beverly Cook, had purchased the Hanover Street property from Paul Ward on April 6, 1992. [*See* Copy of Warranty Deed at Defendants' Ex. 9.] Michael Antonian testified that he and Mr. Cook were partners in a real estate investment company at the time and owned several houses in the Detroit Downriver area which they rented out. *See* Antonian Dep., Plaintiffs' Response Ex. A, pp. 7–9] The Cooks subsequently conveyed their interest in the property to the Antonians on November 17, 1992. [*See* Defendants' Ex. 9.] Mrs. Antonian quit-claimed her interest in the property to her husband and herself on June 23, 1997 (apparently to sever their entireties interest in the property.) *Id.* (There is some mention in Plaintiffs' Complaint of Mr. Antonian having suffered a protracted illness during the 1997–1999 time period, *see* Complaint ¶ 8, and apparently the

quit claim allowed Mrs. Antonian to take action with respect to the property without her husband's participation.) A month later, on July 22, 1997, Mrs. Antonian sold the property to Jason D'Herin on a land contract which called for payment of the purchase price in monthly payments of principal and interest for eight years. [*See* Defendants' Ex. 9.]

All of these property title documents were timely recorded with the Wayne County Register of Deeds. *Id. See also*, Defendants' Ex. 11.

**3.** Mr. LaMontagne was also a member of the Demolition Board of Appeals at the time. (The City Code requires that one member of the board be a certified building official or building inspector. *See* Dearborn Heights Code, § 7–701(b)(4)).

a new report on the condition of the property which showed, contrary to Mr. Antonian's representations, that Mr. Antonian had done nothing to maintain the property over the course of the preceding five months. He reported:

> [Mr. Antonian] did not make the neighborhood look better, we [City workers] have been cutting the lawn. It's about 2' long right now. I just had to go over there and board up a door, a window, and reboard the garage door because people were getting in there and kids were playing in the garage. He has not been keeping up the property. If he was intending to keep the property clean, he should have been by it weekly....
>
> We have pictures of this house from this week showing the front door swinging off the hinges, here is the window and siding people are tearing off, here is the open garage door, there is the back door kicked in, the siding being ripped off, garbage, debris and grass in the backyard, garage falling in, overgrown property. He hasn't done anything to keep up the property.

*Id.*

Based upon Mr. LaMontagne's inspection report, the Board rejected Mr. Antonian's appeal and voted to go forward with the demolition of the property. *Id.*

Six days later, on November 9, 1999, the residence was demolished by a City contractor. Despite the fact that the Dearborn Heights Code provides an aggrieved property owner with an judicial appeal mechanism to appeal in state court from a final decision or order of the Demolition Board of Appeals within 20 days of the

date of the Board's decision,[4] Plaintiffs did not do so. Instead, eighteen months later, on April 28, 2001, Plaintiffs instituted this action.

In their Complaint, Plaintiffs alleged four counts. In Counts I and II, Plaintiffs seek redress pursuant to 42 U.S.C. § 1983 alleging that the City of Dearborn Heights and the Dearborn Heights Demolition Board of Appeals violated their procedural due process rights as a result of their non-compliance with notice and hearing provisions of the Michigan Housing Law, M.C.L. §§ 125.540–542 (Count I) and the Dearborn Heights Code (Count II). They also allege two state law counts—a claim of deprivation of their rights under Article 10, section 2 of the Michigan Constitution (Count III) and a Michigan common law claim for trespass-nuisance (Count IV). However, in their Response to Defendants' Motion for Summary Judgment, Plaintiffs stipulated to the dismissal of their claims against the Demolition Board of Appeals in Counts I and II, and on the record at the May 2, 2002 hearing, Plaintiffs withdrew their Count III claim of violation of the Michigan Constitution. Therefore, the only claims to be adjudicated are Plaintiffs' claims against the City of Dearborn Heights in Counts I and II, and their common law trespass-nuisance claim in Count IV of their Complaint.

## PERTINENT PROVISIONS OF THE DEARBORN HEIGHTS CODE

Section 7–656 of the Dearborn Heights Code delineates the conditions for condemnation of residential property. It provides:

> the decision or order to the circuit court by filing a petition for an order of superintending control within twenty (20) days from the date of the decision.
>
> *See also,* M.C.L. § 125.542 (same).

4. Section 7–702 of the Dearborn Heights Code provides as follows:
   Sec. 7–702. Appeals.
   The property owner aggrieved by any final decision or order of the demolition board of appeals under section 7–701 may appeal

Any dwelling or dwelling unit which shall be found to have any of the following defects shall be condemned as unfit for human habitation and shall be so designated and placarded by the director of building and engineering or his or her designee:

(1) One which is so damaged, decayed, dilapidated, unsanitary, unsafe or vermin-infested that it creates a serious hazard to the health or safety of the occupants or of the public.

(2) One which lacks illumination, ventilation or sanitation facilities adequate to protect the health or safety of the occupants or of the public.

(3) One which, because of its general condition or location, is unsanitary, or otherwise dangerous, to the health or safety of the occupants or the public.[5]

Section 7–701 of the Code establishes the Demolition Board of Appeals. This section provides as follows:

(a) *Formation.* The city does hereby declare the formation of a demolition board of appeals pursuant to Public Act 1917 No. 167, 141c, as amended by Public Act 1992, No. 144, effective March 31, 1993.[6]

(b) *Appointment of members.* The demolition board of appeals shall be appointed by the mayor, subject to the confirmation of the city council, and shall consist of the following members, who shall be residents of the city:

(1) A building contractor;

(2) A registered architect or engineer;

(3) Two (2) members of the general public;

(4) An individual registered as a building official, plan reviewer, or inspector under the Building Officials and Inspectors Registration Act.

Sections 7–482 and 7–483 sets forth the procedure for obtaining a hearing before the board of appeals and delineates the authorized actions of the boards:

Section 7–482 provides:

Any person affected by any notice which has been issued in connection with the enforcement of any provision of this article [or by any notice or order relating to the condemning . . . of a dwelling

---

**5.** In addition to the foregoing condemnation provisions for property deemed unfit for human habitation, Sections 7–481 of the Code sets forth general building code violation enforcement and notice procedures:

(a) Whenever the director buildings and engineering, or his or her designee, determines that there are reasonable grounds to believe that there has been a violation of any of the provisions of this article or of any rule or regulation adopted pursuant thereto, he or she shall give notice of such alleged violation to the person responsible. Such notice shall:

(1) Be in writing.

(2) Include a detailed statement of the specific violations and the remedial action required.

(3) Allow a reasonable time for performance of any act it requires.

(4) Be served upon the owner or his or her agent, or the occupant, as the case may require.

(b) Such notice shall be deemed to be properly served upon such owner or agent, or upon such occupant, if a copy thereof is served upon him or her personally; or if a copy is sent by registered mail to his or her last known address; or if a copy is posted in a conspicuous place in or about the dwelling affected by the notice; or if he or she is served with such notice by any other method authorized or required under the laws of this state.

**6.** Public Act No. 167, 141c is codified at M.C.L. § 125.541c. This statute authorizes the "legislative body" of a city (i.e., the city council) to establish a board of appeals to hear all of the cases and carry out the duties set forth in M.C.L. § 125.541(3) and (4). These duties are to issue notices to, and hear the appeals of, persons affected by any order of demolition. *Id.* The statutory duties are in substance the same board actions authorized in Dearborn Heights Code Sections 7–481—7–483.

or dwelling unit], may request and shall be granted a hearing on the matter... provided that such person shall file in the office of the building and engineering department a written petition requesting such hearing and setting forth a brief statement of the grounds therefor within ten (10) days after the date the notice was served. Upon receipt of such petition... the board of appeals shall set a time and place for such hearing and shall give the petitioner written notice thereof. At such hearing, the petitioner shall be given an opportunity to be heard and to show why such notice should be modified or withdrawn. The hearing shall be commenced not later than ten (10) days after the day on which the petition was filed; provided that upon application of the petitioner, the ... board of appeals may postpone the date of the hearing for a reasonable time beyond such ten-day period if in the judgment of the board the petitioner has submitted a good and sufficient reason for such postponement.

Section 7–483 provides:

(a) After a hearing, the... board of appeals shall sustain, modify or withdraw the notice, depending upon its findings as to whether the provisions of this article and the rules and regulations adopted pursuant thereto have been complied with. If the board sustains or modifies such notice, it shall be deemed to be an order of the board. Any notice serviced pursuant to section 7–482 [sic; 481] shall automatically become an order if a written petition for hearing is not filed in the office of the building and engineering department within ten (10) days after such notice is served....

As noted above, Section 7–702 provides for judicial appeal of a final order of the demolition board of appeals:

The property owner aggrieved by any final decision or order of the demolition board of appeals under section 7–701 may appeal the decision or order to the circuit court by filing a petition for an order of superintending control within twenty (20) days from the date of the decision.

[*See* Excerpts of Dearborn Heights Code attached to Plaintiffs' Complaint at Ex. F.]

### III. *THE PARTIES' SUMMARY JUDGMENT ARGUMENTS*

In their Motion for Summary Judgment, Defendants argue that Plaintiffs' Section 1983 claims against the City of Dearborn Heights should be dismissed because Plaintiffs have failed to establish that a policy or custom of the City was the cause of their injury. With respect to Plaintiffs' common law tort claim for trespass-nuisance, Defendants argue that they are entitled to summary judgment in their favor because they are afforded immunity from tort liability under the Michigan Governmental Immunity Act, M.C.L. § 691.1407.

Plaintiffs have filed a Response disputing Defendants' arguments and have also filed their own cross-motion for partial summary judgment as to Defendants' liability.

### III. *DISCUSSION*

#### A. *STANDARDS APPLICABLE TO MOTIONS FOR SUMMARY JUDGMENT*

Summary judgment is proper " 'if the pleadings, depositions, answer to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.' " Fed. R.Civ.P. 56(c).

Three 1986 Supreme Court cases—*Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348,

89 L.Ed.2d 538 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); and *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)—ushered in a "new era" in the standards of review for a summary judgment motion. These cases, in the aggregate, lowered the movant's burden on a summary judgment motion.[7] According to the *Celotex* Court,

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.

*Celotex,* 477 U.S. at 322, 106 S.Ct. 2548.

After reviewing the above trilogy, the Sixth Circuit established a series of principles to be applied to motions for summary judgment. They are summarized as follows:

> * The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.
>
> * The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."
>
> * The trial court no longer has the duty to search the entire record to establish

that it is bereft of a genuine issue of material fact.

> * The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is plausible.

*Betkerur v. Aultman Hospital Association,* 78 F.3d 1079, 1087 (6th Cir.1996). *See also, Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479–80 (6th Cir.1989). The Court will apply the foregoing standards in deciding the parties' cross-motions for summary judgment in this case.

## B. *PLAINTIFFS' SECTION 1983 CLAIMS FOR VIOLATION OF THEIR DUE PROCESS RIGHTS AGAINST THE CITY*

■ 42 U.S.C. § 1983 furnishes a substantive right and civil cause of action for deprivation of one's civil rights, including the right to procedural due process guaranteed under the Fourteenth Amendment:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia subjects, or causes to be subjected, any citizen of the United States or any other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an ac-

---

**7.** "Taken together the three cases signal to the lower courts that summary judgment can be relied upon more so than in the past to weed out frivolous lawsuits and avoid wasteful trials." 10A C. Wright, A. Miller, M. Kane, *Federal Practice & Procedure,* § 2727, at 35 (1996 Supp.).

tion at law, suit in equity, or other property proceeding for redress.

The Supreme Court has held that municipalities are "persons" subject to suit under § 1983. *Monell v. New York City Dep't of Social Services*, 436 U.S. 658, 700–01, 98 S.Ct. 2018, 2041, 56 L.Ed.2d 611 (1978). Municipalities are not, however, liable for every misdeed of their employees and agents. "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694, 98 S.Ct. at 2037–38.

In the years since *Monell*, the Supreme Court has further delineated the contours of municipal liability under Section 1983. In *Pembaur v. Cincinnati*, 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986), the Court articulated several guiding principles to be applied in determining whether an isolated act by a municipality's officials or employees is enough to establish an unconstitutional policy: First, a municipality may be held liable under Section 1983 only for actions which it "officially sanctioned or ordered." 475 U.S. at 480, 106 S.Ct. at 1298. Second, only those municipal officials who have "final policymaking authority" may by their actions subject the government to § 1983 liability. *Id.* at 483, 106 S.Ct. at 1300. Third, whether a particular official has "final policymaking authority" is a question of state law. *Id.* Finally, the challenged action must have been taken pursuant to a policy adopted by the official or officials responsible under state law for making policy in that area of the city's business. *Id.* at 482–83, and n. 12, 106 S.Ct. at 1299–1300, and n. 12.

In *City of St. Louis v. Praprotnik*, 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988), the Court further clarified these principles with respect to the issue of identification of "policymaking officials":

We begin by reiterating that the identification of policymaking officials is a question of state law. "Authority to make municipal policy may be granted directly by a legislative enactment or may be delegated by an official who possesses such authority, and of course, whether an official has final policymaking authority is a question of state law." *Pembaur v. Cincinnati, supra* 475 U.S., at 483, 106 S.Ct., at 1300 (plurality opinion). Thus, the identification of policymaking officials is not a question of federal law, and it is not a question of fact in the usual sense. The States have extremely wide latitude in determining the form that local government takes, and local preferences have led to a profusion of distinct forms. Among the many kinds of municipal corporations, political subdivisions and special districts of all sorts, one may expect to find a rich variety of ways in which the power of government is distributed among a host of different officials and official bodies.... Without attempting to canvass the numberless factual scenarios that may come to light in litigation, we can be confident that state law (which may include valid local ordinances and regulations) will always direct a court to some official or body that has the responsibility for making law or setting policy in any given area of a local government's business.

\*   \*   \*   \*   \*   \*

As the plurality in *Pembaur* recognized, special difficulties can arise when it is contended that a municipal policymaker has delegated his policymaking authority to another official. (Citations omitted). If the mere exercise of discretion by an employee could give rise to a constitutional violation, the result would

be indistinguishable from *respondeat superior* liability....

Second, as the *Pembaur* plurality recognized, the authority to make municipal policy is the authority to make *final* policy. (Citations omitted.) **When an official's discretionary decisions are constrained by policies not of that official's making,** *those policies, rather than the subordinate's departures from them,* **are the act of the municipality.** Similarly, when a subordinate's decision is subject to review by the municipality's authorized policymakers, they have retained the authority to measure the official's conduct for conformance with *their* policies. If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final....

... **Simply going along with discretionary decisions made by one's subordinates, however, is not a delegation to them of the authority to make policy.** It is equally consistent with a presumption that the subordinates are faithfully attempting to comply with the policies that are supposed to guide them. It would be a different matter if a particular decision by a subordinate was cast in the form of a policy statement and expressly approved by the supervising policymaker. It would also be a different matter is a series of decisions by a subordinate official manifested a "custom or usage" of which the supervisor must have been aware. (Citation omitted). In both those cases, the supervisor could realistically be deemed to have adopted a policy that happened to have been formulated or initiated by a lower-ranking official. But the mere failure to investigate the basis of a subordinate's decisions does not amount to a delegation of policymaking authority....

485 U.S. at 124–130, 108 S.Ct. at 924–928 (emphasis in original; footnotes omitted).

The Sixth Circuit has summarized the trial court's duty under the foregoing principles as follows:

As both *Praprotnik* and *Pembaur* reveal, the judge in a delegation [of authority] case must determine whether the municipal official identified as the maker of policy resulting in the constitutional violation was afforded merely the final authority to *act* on the delegator's behalf, or whether he was given final authority to *establish policy* with respect to the challenged action.

*Perrino v. City of Newton Falls,* 972 F.2d 348, 1992 WL 197328 (6th Cir.1992) (unpublished opinion; text available on WESTLAW).

In *Bennett v. City of Slidell,* 728 F.2d 762 (5th Cir.1984), the court applied the foregoing principles in the context of building code violations and zoning restrictions. In that case, the plaintiff alleged that the delays of his liquor license and occupancy permit and the termination of his electrical service were the result of official city policy. The plaintiff argued that the building inspector's authority to issue or deny occupancy permits represented official policy of the city. The Fifth Circuit disagreed explaining:

The building inspector's job was to execute or administer city policy, established by the city council in its building code. He obtained his authority from the chief administrative officer of the city. His decisions were appealable to the board of zoning adjustments and to the city council. His decisions were perhaps discretionary and ministerial, but he had no authority to act in lieu of the council to set or modify city policy.

728 F.2d at 769–70. *See also, Emery v. City of Toledo,* 178 F.3d 1294, 1999 WL 196533 (6th Cir.1999) (unpublished deci-

sion; text available on WESTLAW) (where plaintiff failed to establish that an official policymaker made the decision to "exceed the bounds" of the demolition order and demolish more of his property than was delineated in the order municipal liability under Section 1983 was not established and district court properly granted the city's motion to dismiss).

Applying the foregoing principles to the facts of this case, the Court finds that Plaintiffs' have failed to make out a legally cognizable Section 1983 claim against the City of Dearborn Heights.

Plaintiffs contend that the City of Dearborn Heights "established a Demolition Board of Appeals to be responsible for establishing and carrying out policy with respect to demolitions." While the Dearborn Heights Code designates the Demolition Board of Appeals as the city agency authorized to hear the appeals of persons affected by any notice or order relating to the condemning of a dwelling, there is nothing of record which shows that the Board is responsible for *establishing* demolition *policy*. While the Board is authorized pursuant to the Code to conduct hearings, make findings, and to decide, based upon such findings, whether to sustain, modify or withdraw a notice or order of condemnation or demolition, *see* Dearborn Heights Code, § 7–483(a), as the Sixth Circuit observed in *Perrino v. City of Newton Falls, supra,* such authority may be the final authority to *act* on the City Council's behalf, but that does not mean that the Board has been given final authority to *establish policy* with respect to demolitions. *See also, Bennett v. City of Slidell, supra* (where the city building

inspector's job was to execute or administer city policy established by the city council in its building code, his decisions were perhaps " discretionary and ministerial, but he had no authority to act in lieu of the council to set or modify city policy." 728 F.2d at 770.) [8]

Dearborn Heights Building Director Edward Opalewski testified in his deposition that "There is a standard for demolition within the city, along with all of the requirements on it, and that is generally what is followed in all situations." *See* Opalewski Dep., p. 19, Defendants' Ex. 3. Mr. Opalewski explained these standards:

> It depends on the integrity of the structure that's there. After that, the other thing that comes into play is if there were repairs that needed to be brought about and were not. Then that board would consider the actions of a full demolition of the structure.

*Id.* at 18. *See also,* "Conditions for Condemnation," Dearborn Heights Code § 7–652, Complaint Ex. F.

The foregoing makes clear that demolition policy is set by Dearborn Heights City Council, as delineated in the City Code, *not* by the Building Inspector or the Board of Demolition Appeals. While the Building Inspector and the Board have been given final authority to act on behalf of the City Council with respect to deciding whether property should be demolished, they have not been given final authority to make demolition policy for the City.

Nor do the facts that the Dearborn Heights City Council had, pursuant to a bid process, awarded a three-year contract

---

**8.** Plaintiffs' reliance on this Court's decision in *Fruman v. City of Detroit,* 1 F.Supp.2d 665 (E.D.Mich.1998) is misplaced. In *Fruman,* the Detroit City Council—the policy-making body of the City of Detroit—enacted an unconstitutional ordinance that did not safeguard the plaintiff-property owner's due

process rights and acted pursuant to that ordinance when it ordered the demolition of the plaintiff's property. In this case, there is no question as to the constitutionality of the city ordinances themselves and the actions challenged are those taken pursuant to the ordinances by a non-policymaking body.

to a private contractor, Ellefson Demolition Company, to perform demolitions for the City, and that Ellefson did the demolition work on the subject property pursuant to a request from Building Inspector LaMontagne establish that LaMontagne had final policy making authority with respect to demolitions. Like the building inspector in *Bennett v. City of Slidell, supra,* all that Mr. LaMontagne did by requesting Ellefson to demolish the Plaintiffs' property was to execute and administer the City's policy.

Plaintiffs contend that the fact that the City's bid sheet form—which was provided to all bidding demolition contractors and which Ellefson Demolition Company used in submitting its bid—stated "Work to be started within five (5) days after receipt of Notice to Proceed," establishes that the City Council adopted a policy to violate the 20–day appeal period provided in Section 7–702 of the City Code. Plaintiffs apparently deem this provision to mean that the City required all bidders to agree that all demolitions would to be completed within five days of the order of demolition. The plain language of the bid form belies Plaintiffs' argument. The bid sheet plainly states only that demolitions are to be completed *within five days after receipt of notice to proceed,* not *within five days of the order of demolition.* Furthermore, there is no written contract evidencing the City's contract with Ellefson. The only record pertaining to the Ellefson contract is a copy of the motion made by Councilman Paletko and adopted by the full council on March 10, 1999. [*See* Plaintiffs' Ex. L]. It states only that the council voted "to award a three-year contract effective immediately to Ellefson Demolition Company, Inc., 26276 Van Buren, Dearborn

Heights, MI 48127, for all demolitions in the City of Dearborn Heights, at the unit prices listed in their bid proposal." *Id.* Nothing was stated by the City Council that all work was to be done within five days of the Demolition Board of Appeals' issuance of a demolition order. Thus, it is clear that neither the bid sheet nor the City's contract with Ellefson contradicts or abrogates Section 7–702 of the City Code.

Plaintiffs make much of Building Inspector Ken LaMontagne's deposition admission that he did not direct Ellefson Demolition to wait for 20 days before demolishing the property and that the demolition of Plaintiffs' property only six days after the Board of Demolition Appeals ordered the demolition violated the Dearborn Heights ordinance which provided a 20–day time period for an aggrieved property owner to appeal a Board decision to the Circuit Court. *See* LaMontagne Dep., Plaintiffs' Ex. G, p. 25.

Plaintiffs claim that LaMontagne's admission establishes that the City of Dearborn Heights is liable to them under Section 1983. In this regard, Plaintiffs' claim is substantially similar to the claim of the plaintiffs in *Follkie v. City of Chicago,* 1997 WL 527304 (N.D.Ill.1997).

In *Follkie,* the plaintiffs owned residential property in the City of Chicago. The buildings on the property—a two-unit residential building and a coach house—were vacant and had fallen into disrepair. The City proceeded to demolish the property pursuant to the "fast track" provisions of the Illinois demolition statute and the Chicago Municipal Code. The plaintiffs complained that the City failed to comply with the notification requirements of the statute and the city Code [9] prior to demolishing

---

9. The statute, 65 ILCS 5/11–31–1(e), and section 13–9–010 of the city code called for posting a notice on the property and sending a notice by certified mail to the property owners. Under § 13–9–010, the building commissioner and the department of buildings are responsible for implementing these notice provisions.

their structures and, therefore, the City was liable to them under Section 1983 for deprivation of their Fifth and Fourteenth Amendment due process rights. The plaintiffs in *Follkie* did not demonstrate, as the basis for their Section 1983 claims against the city, any "widespread municipal practices" (so as to establish a municipal policy by custom), nor did they establish that the actions complained of were taken by a person entrusted with final policymaking authority. Rather, to establish city policy, they pointed to the city code notice and hearing provisions which had not been complied with when their property was demolished. The court found that Section 1983 liability could not be predicated on those provisions, explaining:

> [P]laintiffs fail to allege that an express City policy caused their damages. Although plaintiffs reference Section 13–9–010, they do not contend that the *enforcement* of this express policy caused the alleged unconstitutional deprivation. In fact, plaintiffs allege just the opposite—City officials' *noncompliance* with the notification requirements caused their damages.

1997 WL 527304 at * 3 (emphasis in original).

The same is true in the instant action. It is not the Dearborn Heights Code provisions which Plaintiffs claim caused the alleged constitutional deprivation, rather it is the noncompliance with the Code provisions which caused their damages.

In their post-hearing brief, Plaintiffs attempt to distinguish their claim from that of the plaintiffs in *Follkie* by purporting to show a policy of custom based on a "widespread practice" on the part of the City of Dearborn Heights to violate the 20–day appeal provision in the City Code. In support of this contention, Plaintiffs have submitted copies of minutes from four meetings of the Demolition Board of Appeals—October 6, 1998, February 2, 1999, August 31, 1999 and November 3, 1999—which show that the Board did not inform any of the property owners appearing at those meetings that they had a 20 days to appeal an adverse decision. The problem with Plaintiffs' evidence is that it does not support their "widespread practice" argument.

Plaintiffs' evidence shows that 27 demolition orders were appealed from October 1998 through November 3, 1999. Of the 27 demolition orders appealed, in 19 cases, the Board did not order demolition but rather granted the appellants additional time to correct the Building Code violations cited. In four other cases, the Board merely ordered that hearing or demolition notices be sent to the property owners. The Board only ordered demolition in four cases and in two of those cases, the appellants *agreed* to the demolition as ordered. Thus, even accepting Plaintiffs' "absence-of-notification-of-appeal-right-argument" as evidence of violation of the City Code's 20–day appeal provision, at best Plaintiffs have produced evidence of two instances where the Board ordered that the property in question be demolished in less than 20 days, without notifying the appellants at the hearing that they had 20 days to take a judicial appeal the demolition decision. Even assuming *arguendo* that the Board had an obligation to specifically notify unsuccessful appellants of their right to take a judicial appeal within 20 days, two incidents do not amount to a "widespread" municipal practice or custom. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167, 90 S.Ct. 1598, 1613, 26 L.Ed.2d 142 (1970) (custom denotes "persistent and widespread . . . practices"); *Nashville, Chattanooga & St. Louis Railway v. Browning,* 310 U.S. 362, 369, 60 S.Ct. 968, 972, 84 L.Ed. 1254 (1940) (custom denotes settled governmental practice or "[d]eeply embedded traditional ways of carrying out (government) policy").

Similarly, Plaintiffs' attempt to cast Building Inspector LaMontagne as having been entrusted with final policymaking authority with respect to Dearborn Heights demolitions is without merit. As discussed above, only the City Council is entrusted with making demolitions *policy.* The Board of Demolition Appeals is entrusted with the responsibility of acting on that policy and as such, is the body responsible for deciding whether or not a house should be demolished. Mr. LaMontagne merely carries out the orders of the Board. He has no independent authority to order a demolition, nor does he have any authority to derogate from the City Code provisions regulating demolitions or the Board's orders. The Board did not direct that demolition of Plaintiffs' house occur before the expiration of the 20–day appeal period. The inescapable conclusion, therefore, is that when LaMontagne directed the demolition contractor to proceed with the demolition of Plaintiffs' house before the 20–day appeal period had expired, he did so without authority. *See Bennett v. City of Slidell, supra* (building inspector's job is to execute or administer city policy established by the city council in its building code; he has no authority to act in lieu of the council to set or modify city policy. 728 F.2d at 770.) Therefore, like the plaintiffs in *Follkie,* Plaintiffs' damages were not caused by a City of Dearborn Heights policy; they were caused by a city official's non-compliance with City policy. Under these circumstances, the City incurs no Section 1983 liability.

For all of the foregoing reasons, the Court finds that Plaintiffs have failed to establish that their alleged constitutional injuries were inflicted pursuant to a City of Dearborn Heights policy or custom. Therefore, the Court determines that Plaintiffs have failed to establish a legally cognizable Section 1983 claim against the City of Dearborn Heights. Accordingly, Defendants' Motion for Summary Judg-

ment will be granted on Counts I and II of Plaintiffs' Complaint.

## C. DEFENDANTS ARE NOT PROTECTED BY THE MICHIGAN GOVERNMENTAL IMMUNITY ACT WITH RESPECT TO PLAINTIFFS' CLAIM FOR TRESPASS–NUISANCE

■ Count IV of Plaintiffs' Complaint alleges the Michigan common law tort of trespass-nuisance. The tort of trespass-nuisance is defined as "trespass or interference with the use and enjoyment of land caused by a physical intrusion that is set in motion by the government or its agents and resulting in personal or property damage." *Continental Paper & Supply Co., Inc. v. City of Detroit,* 451 Mich. 162, 164, 545 N.W.2d 657, 658 (1996); *Hadfield v. Oakland Co. Drain Comm'r,* 430 Mich. 139, 169, 422 N.W.2d 205 (1988). To establish trespass-nuisance, a plaintiff must show: (1) condition (nuisance or trespass); (2) cause (physical intrusion); and (3) causation or control (by government). *Continental Paper, supra,* at 164, 545 N.W.2d 657; *Hadfield, supra,* at 169, 422 N.W.2d 205; *CS&P, Inc. v. City of Midland,* 229 Mich.App. 141, 145, 580 N.W.2d 468, 470 (1998). The trespass-nuisance doctrine applies only to state and local governments. *Id.; Cloverleaf Car Co. v. Phillips Petroleum Co.,* 213 Mich.App. 186, 193, 540 N.W.2d 297 (1995). A city's demolition of private property has been found to constitute trespass-nuisance. *See Ramsey v. City of Detroit,* 2000 WL 33535522 (Mich. App.2000) (unpublished decision; text available on WESTLAW).

Defendants argue, however, that, as governmental entities engaged in the discharge of a governmental function, they are afforded immunity from tort liability under the Michigan Governmental Immu-

nity Act, M.C.L. § 691.1407(1), which provides:

> Except as otherwise provided in this Act, all governmental agencies shall be immune from tort liability in all cases wherein the governmental agency is engaged in the exercise or discharge of a governmental function.

"Governmental function" is defined in the Act as "an activity which is expressly or impliedly mandated or authorized by constitution, statute, local charter or ordinance, or other law." As discussed above in this Opinion and Order, the operation of a demolition board of appeals of a municipality is expressly authorized both by Michigan statute, M.C.L. § 125.541c and by local ordinance, § 7–701 of the Dearborn Heights Code.

However, there are a number of exceptions to governmental immunity in Michigan. In addition to the five statutory exceptions—(1) failure to maintain highways, (2) the negligent operation of government-owned vehicles, (3) public building defects, (4) the performance of proprietary functions, and (5) the ownership or operation of a governmental hospital—the Michigan Supreme Court has recognized trespass-nuisance as a common law exception to governmental immunity. *See Hadfield v. Oakland County Drain Comm'r, supra.*

Although acknowledging that Michigan courts have recognized and applied the common law exception to governmental immunity, in their Response to Plaintiffs' Motion for Summary Judgment, Defendants relied upon comments made by Michigan Supreme Court Justice Weaver in her concurrence to the grant of leave to appeal in the consolidated cases of *Pohutski v. City of Allen Park,* 463 Mich. 967, 621 N.W.2d 228 (2001) and *Jones v. City of Farmington Hills,* 463 Mich. 968, 621 N.W.2d 226 (2001) indicating that the Michigan Supreme Court was going to revisit the issue of whether the tort of tres-

pass-nuisance should be an exception to the Governmental Immunity Act. Defendants, in fact, proved to be correct. On April 2, 2002, the Michigan Supreme Court did readdress the issue in *Pohutski* and *Jones.* The Court expressly overruled *Hadfield* and held that there is no common law trespass-nuisance exception to the Michigan Governmental Immunity Act. *See Pohutski v. City of Allen Park,* 465 Mich. 675, 641 N.W.2d 219, 229–232 (2002). However, the Court specified that their decision is to be given only prospective application:

> [T]his decision will be applied only to cases brought on or after April 2, 2002. **In all cases currently pending, the interpretation set forth in *Hadfield* will apply.**

465 Mich. at 699, 641 N.W.2d at 233 (emphasis added).

█ Therefore, for purposes of the instant action, governmental immunity does not bar Plaintiffs' trespass-nuisance claim. As governmental immunity is the only basis asserted by Defendants for summary judgment on this claim, Defendants' motion will be denied on Count IV of Plaintiffs' Complaint. Further, the undisputed facts establish that Plaintiffs have made out the elements of a trespass-nuisance claim. Therefore, Plaintiffs are entitled to summary judgment on liability on this claim.

As indicated above, to establish trespass-nuisance, a plaintiff must show: (1) condition (nuisance or trespass); (2) cause (physical intrusion); and (3) causation or control (by government). *Continental Paper, supra,* at 164, 545 N.W.2d 657; *Hadfield, supra,* at 169, 422 N.W.2d 205. In Michigan, trespass has been defined to be any unauthorized intrusion or invasion of the private premises or lands of another. *Giddings v. Rogalewski,* 192 Mich. 319, 158 N.W. 951 (1916); *Douglas v. Bergland,* 216

Mich. 380, 185 N.W. 819 (1921). *See also, Antkiewicz v. Motorists Mutual Ins. Co.,* 91 Mich.App. 389, 396, 283 N.W.2d 749, 753 (1979), *vacated on other grounds,* 407 Mich. 936, 285 N.W.2d 659 (1979). *See also, Fruman v. City of Detroit,* 1 F.Supp.2d 665, 675 (E.D.Mich.1998) (applying Michigan law).

While it is true that normally, a public officer who is on the premises of another pursuant to legal authorization is not liable for trespass, *Antkiewicz, supra;* 87 C.J.S. Trespass § 54, it is undisputed that the demolition of Plaintiffs' property was not done in compliance with the Dearborn Heights City Code. Building Inspector La-Montagne admitted in his deposition that he did not direct the demolition contractor to wait 20 days before commencing demolition. He further admitted that the city ordinance affording a person a 20–day period to appeal a final order of the Demolition Board of Appeals was violated and Plaintiffs' property was demolished only six days after entry of the Board's order. Therefore, Defendants' demolition of Plaintiffs' property in this case was not done pursuant to legal authorization. When a city fails to comply with its own ordinances governing demolition, it may be held liable for trespass when it demolishes the plaintiff's property. *See Fruman v. City of Detroit, supra,* 1 F.Supp.2d at 675.

Because the Court finds that there is no material factual dispute as to this claim, as a matter of law, Plaintiffs' cross-motion for summary judgment as to the City of Dearborn Heights' liability on this claim will be granted.

### CONCLUSION

For all of the reasons set forth in this Opinion and Order,

IT IS HEREBY ORDERED that Defendants' Motion for Summary Judgment and Plaintiffs' Motion for Partial Summary Judgment on Liability are granted in part and denied in part, as follows:

Defendants' Motion for Summary Judgment is GRANTED on Counts I, II, and III of Plaintiffs' Complaint and Plaintiffs' Cross–Motion for Partial Summary Judgment on Liability on these three Counts is denied. Accordingly, Counts I, II and III of Plaintiffs' Complaint are DISMISSED with prejudice. However, with respect to Count IV of Plaintiff's Complaint, Defendants' Motion for Summary Judgment is DENIED and Plaintiffs' Cross–Motion for Partial Summary Judgment on liability is GRANTED as to Defendant City of Dearborn Heights.

This case, accordingly, will proceed only on the issue of Count IV damages.

SO ORDERED.